22-5202, Sandoz Inc. vs. Xavier Becerra, in the Official Capacity of the Secretary of Health and Human Services, et al. Mr. Jay, for the appellant. Mr. Hazel, for the appellate. Good morning. Good morning, Your Honors. May it please the Court, William Jay, for the appellant. I'll start by thanking the Court for hearing this on an expedited basis. Sanofi should not have received a second five-year period of exclusivity in this case. New chemical entity exclusivity was inappropriate because terraflutamide had been approved. It was not newly approved. When FDA reviewed the new drug application for Arava, it approved that application and all of its components, including terraflutamide. FDA set permissible levels for terraflutamide. It determined that a drug containing that amount of terraflutamide was safe and effective, could be used in humans. And it did so knowing that terraflutamide was responsible for the activity of the drug product in the human body. Now, a biogeo may well have qualified... Can I ask you a fact question? Do impurities get listed on the label? I'm sorry. Do impurities get listed on the label as an ingredient? Impurities do not get listed on the label as an ingredient. The specification is where impurities and their... Right. They don't go over a certain amount. Pardon? The limitation on going over, is it .3 or .35 in this case, right? That's right. It's in the specification as part of the new drug application file. It is not one of the things that has to appear on the label, just as, for example, the quantity of an inactive ingredient is controlled. It doesn't have to appear on the label either. The inactive ingredients don't appear on the label at all? The names of the inactive ingredients do. The quantity does not. Okay. Let me try asking again then. Do the names of impurities get listed on the label too? No. They don't. The difference between inactive ingredients and impurities in that respect? That is a difference in how they are treated. I wouldn't say that that's a difference relevant to whether they are approved, because the ordinary meaning of approved, which I think we in the district court and the government basically agree on, is whether the FDA has given its permission or its sanction for, in this case, terraflumide to appear in the drug product in particular quantities. And it does. If terraflumide exceeded that quantity in ARAVA, the drug would be misbranded. Mr. Jay, for a moment, I think at a very kind of hyper-literal level, your reading of the statute makes sense. But what I am having more trouble seeing, though, is how that understanding of those words fits with the structure of the statute and the way that the FDA approves new drugs. Because it seems, you know, if you're just looking at these few words out of context, you know, perhaps your argument holds up. But when I go broader to the rest of the statute, it seems much harder to fit. I think we embrace the look at the statutory structure, Your Honor. And I think there are several things I'd like to point to. One is the approval statute, and one is how impurities are treated in the approval, the agency's practice of approval, which is, of course, not in the statute. But if you wanted to look at that, we think it actually supports that. So, statutorily, the exclusivity statute refers you back to B. It says applications approved under B. How is an application approved under B? When you look at C, C-1 says if none of the things that are in D are true, then you shall approve the application. It says you approve the application, not an active ingredient, not a set of the ingredients, not any subset, like the subset that the government is pushing for. It says you approve the application. And that's common ground. And actually, the government has said that it agrees that inactive ingredients are approved as well. So, in other words, there's nothing in the approval statute that points you to the approval of active ingredients specifically, right? This statute, and it's cognate for 505B2, is the only place you will find a reference to approval of an active ingredient. The statute's now been amended. It says active moiety, but it's the only place you'll find that. And the district court said, well, the statute refers to approval of an active ingredient, but it just referred back to this same statute, which is completely circular. The only references to approval in the approval portions of Section 505 refer to approval of the application. So, we think structurally, at a statutory level, it makes complete sense to say that FDA is approving each of the components of the drug product as a whole. That makes structural sense because- That's right, except that it's approval as such. I mean, that's really the most reasonable way to read it, isn't it? It's the way the FDA has, for 30 years, read it, that the approval is of an impurity as an impurity, an active ingredient as an active ingredient, and an inactive ingredient as an inactive ingredient. I mean, that's what is approved, is a drug so described. So, what's approved is the entire combination. Right. And so, I certainly agree that there's a difference between approving something in a small quantity and a large quantity. FDA might well say, well, we've approved this in small quantities before, but this is a much larger quantity, so we have to look at it more carefully. And it is looking at the combination as a whole. I don't think it is the label, though, that is significant to what FDA is approving. It's looking at the safety and effectiveness of the drug product as a whole. You don't mean the drug label. You mean the reference to the ingredient as active, inactive, or an impurity? That's right. I don't mean the drug labeling. I mean that FDA's job under the statute is to determine whether the product is safe and effective. The control of impurities is absolutely a part of that, and this is the agency practice point that I was getting to the second half of my answer to the crowd. If you look, for example, at the manual that appears at Joint Appendix 686, you will see that it says specifications are critical quality standards. They are approved by regulatory authorities as conditions of approval. So, you have to follow your specification. That is where the impurity criteria appear in the specification, but that is just a label. Again, not the labeling. That is just a word. Name. That is a name, a characterization. That, I think, doesn't have significance for the statutory question before this court, which is, is that substance approved in the prior application? They approve it. Do they not approve drugs to be – they tell you with some granular detail what has to be on labels, correct? On labels, yes. Yes, and don't they approve it for use consistent with what they've approved on the labeling? It has to be safe and effective as labeled. As labeled. And so, does that not tell us, and since the impurities make no appearance on the label, that what they are approving – and we can table the question of inactive ingredients for now because they do show up on that label – that that is, in fact, what they are approving for you to market to the public? I don't think so for a couple of reasons, and let me just be more precise in my answer to your prior question. You asked whether impurities generally appear on labels. I do want to point out that terraflutamide, in this case, does appear in the above labeling because it is – the labeling makes clear that it is responsible for the activity in vivo. Oh, right. You're talking about the in vivo part but not the impurity part. That's right. I just wanted to be pretty clear on that point. So, if the question is, does the set of things that are required to be on the labeling govern what is approved for purposes of the exclusivity statute? I don't think so for a couple of reasons. I'm just adding that to Judge Rouse's structural point here that that's really the understanding – the general understanding of what is approved and approved in a very – it's a very regimented review. Well, it is regimented, and, for example, inactive ingredients are absolutely approved not just as a name or as an ingredient but in a particular quantity and together with the rest of the combination. The quantity of the inactive ingredient doesn't have to appear in the labeling in the same way, but just as the good manufacturing practices might or might not reflect on the labeling, but the FDA controls those quite rigorously. So, just as a product can still be misbranded if it contains too much of an inactive ingredient, a product can be misbranded if it contains too much of an impurity, especially where the purpose of controlling – Sure, because they haven't approved you to market it with that extra amount of impurity in there. That's right, exactly. It has not been – it has been approved to market with that amount of impurity. But not under the label. Well, it's not labeled, but it is – in other words, the FDA has not – I think they control – they certainly control the – I think your point is precisely this, that part of the big picture of what they sign off on is this amount of active ingredient, this amount of inactive ingredient, which they are, and we will not tolerate anything more than X amount of impurity. I take it that's your point. That's sort of the big picture here of what gets authorized, to avoid using the loaded term approved, authorized for release to the public at the end of the day. That is what gets it approved. And the piece of the statutory standard for approval that this goes to is safety, because if you look at the two guidances and the manual that are in the record, so the – in particular, there's a whole guidance devoted to degradation products and at what level they must be reported, at what level they must be identified, and at what level they must be qualified. And that means – If the manufacturer were to throw in a whole new ingredient altogether, I'm just going to add a little bit of this in because it makes everybody feel good. Agile impurity is a small amount. It's never mentioned. It's the FDA. That's certainly forbidden, correct? Any change in the composition. Any change in the composition. Including the impurity as part of the composition. So at some level, when they approve, they're approving these things and nothing else. They're approving the composition. And nothing else. That's right. Now, because of the phenomenon of degradation, right, that some portions of the active ingredient may degrade into other things when they react chemically with the packaging or with the inactive ingredient, which is exactly what we have here, that means that there is some – But they sign off on how much of that. Exactly. The approval extends to – How much of that is going to degrade into terraflunamide over the life of the product, including before it's even put on the shelf. That's exactly right. And all of that goes to the composition, which is one of the statutory things that NDA is required to detail. Isn't the approval different for active ingredients and inactive ingredients and impurities? I mean, so the FDA is looking to see what the therapeutic benefit is of the active ingredient, right? It looks at these – I know it has to approve the application as a whole, but what it's really approving is do five milligrams of this drug have a certain effect, a certain therapeutic effect? Do 15 milligrams have a different effect, right? It's looking at the therapeutic operation of the active ingredient. And then it's, I think, also looking to see whether, you know, the impurities and the inactive ingredients are safe to be included with the active ingredients. I mean, doesn't that make a difference for how we think about what's happening in the statute? I don't think so because, as your question recognizes, there's effectiveness and there's also safety. The inactive ingredients, for example, may not contribute to effectiveness, but they absolutely have – although they might, let me just say parenthetically, they might in some instances create a problem for effectiveness if they react with the drug product – I'm sorry, the drug substance to degrade it or have some undesirable interaction. But the portion of the review that extends to safety, I think, looks at the entire composition and whether it is safe and effective together. That includes with the quantity of impurity that is controlled. If you look at Q3B guidance that is in the record, you will see that qualification of an impurity is an important step that the agency takes because an impurity has to be qualified in order for the agency to reassure itself that that impurity is safe. That may well include review of clinical or non-clinical studies, published literature, and so on. It's not just whatever the manufacturer wants, they write a number down. But the fact that those may be approved for use as part of some other therapeutic application, I mean, why does that mean that the FDA has approved it for all future uses in a way that doesn't get future exclusivity? So if a drug manufacturer has put in a lot of time and effort to determine that a previously, like an ingredient that was once inactive has new therapeutic use, why shouldn't that get five-year exclusivity? I think the answer is because it gets three-year exclusivity. Three-year exclusivity is exactly what the statute contemplates for a new use of an old molecule. A non-new chemical entity can absolutely be the basis of a significant clinical innovation and you get a lesser reward for that, three years of exclusivity. But where it's not a new chemical entity, you have to look at the countervailing consequence that giving five years of exclusivity, which actually blocks generic competition for even longer than five years, let's say seven and a half years, that is a reward that is limited for the most significant innovations involving a genuinely new chemical entity. And the facts of this case illustrate why. Because the Olvagio NDA was able to jump the line a little bit. It was able to, you know, I wanted to put it this way, to stand on the shoulders of the Liflunomide NDA in relevant senses because paraflunomide had already been extensively studied. And you can see that in a couple of spots. 497, the agency says in the safety review of Olvagio, oh, these two drugs are fairly viewed as one and the same in terms of their effects. Mr. Jay, we don't have any evidence that, is it, Hoest in 1998 intended paraflunomide degradant to have a therapeutic effect. We have no evidence of that. Do you have the patent application filed by them before that date? It was filed by Sanofi Aventis before it merged with Hoest. So we're talking about the U.S. patent application? I think so. Right in front of me. I think it was a different firm that filed it. I'm not sure that's correct, but let me look at that and confirm. But my understanding is that at least some of the patents that we're talking about here have been assigned to Sanofi because they now own Hoest. And that is one source of evidence about the desirability of the small amounts of paraflunomide and why they might- As a degradant in Arava. So in the same quantity. Yeah, so if you look at the claims of the 222 U.S. patent- But not as a degradant? It doesn't say as a degradant. It just says a composition that comprises substance number two, which is paraflunomide, in a range, the bottom end of which is 0.3% of the other ingredient, substance one, which is leflunomide. So that is a range into which the approved levels of paraflunomide in Arava would fall. 0.3%? 0.3% and up. And the upper limit is substantially above anything that would be in the Arava NDA. But 0.3% is below the approved level, both at the time of launch, and certainly is below the 3.5% that the product is allowed to contain. And tell us a little bit about your opposition to their contention that you never preserved in the administrative process, your current claim that it was not a challenge to the statute. As they point out several times in their brief, this is their longstanding interpretation in which they proposed in 1989 and adopted in 1994. They say they've been rock-solidly behind it ever since. Given that, and that they would have to change their regulation, if this court doesn't declare it invalid, given that they would have to change their regulation, I think that pursuing it within the agency would have been futile in general. But there's a specific reason why that's so here. Because recall that this is all about whether Sandoz is the first filer or the first applicant. And so if the agency were to promulgate a new rule today to say, here's our new interpretation, it is not at all clear that they could give us relief by changing their rule from our filing back in 2006. So that I think is just- Wait, what if they were to promulgate a new rule when you had raised this issue in your first letter to the FDA, objecting? Would that have been enough time to promulgate a new rule? I don't think so. Sorry, when did you initiate the regulatory process? When did you first forget the first filing date? So we initiated the process a short time before filing our generic application. Which was what date? That was September of 2006, September 7, 2006. 16, I'm sorry. 2016 to 2022 isn't enough time to issue a new regulation? Oh, no, I think that once the other generics filed their applications a few days later, remember that Abbaggio had already been awarded exclusivity. And so the agency had already acted on its view and refused to receive our application and then received everyone else on the 40-year anniversary. I think it's not at all clear to us that the agency, if it conducted notice and comment rulemaking, could have retroactively said that Abbaggio was not going to be entitled to- It's not at all clear, which sounds like a good reason for exhaustion. Well- I take your point they had a published regulation. Are you aware of a case that said the existence of a published regulation counts as futility, that automatically qualifies as a futility exception to exhaustion? Let me just quickly, automatically, but let me answer your question. We're not saying it's automatic, but in the circumstance of this case, we think it's futile. So we cite Verizon. Verizon, in turn, cites OmniPoint. Both of those cases are FCC cases. In those cases, the FCC did not even have a regulation on point. The FCC had taken this longstanding position in a published order, which obviously is subject to lesser restrictions on change by the EPA. So we do think that it follows from those cases that where there's a published regulation, that not quite a fortiori, but certainly under the circumstances- So any time an agency has an announced interpretation, some formally announced, not something informal or internal, but a formally publicly announced interpretation of a statute, exhaustion is no longer- to challenge that, exhaustion is no longer required? I would say that I think you would look, as you always do, at whether the purposes of the exhaustion doctrine would be furthered by requiring the litigant to bring not just a challenge, in this case the FDA had this procedure for bringing a challenge. We followed that. But we also have had to bring a petition for rulemaking separately. And I do not think that that would have been practicable to give us relief in time to get our- And ask for expedited rulemaking. In a week, Your Honor? Is it relevant? I'm just not sure about how much leeway the FDA has here, but I've been just thinking about the last case, and I know you heard the argument there. I mean, what if exhaustion just gives the agency a chance to come to a resolution? So they could have taken the view that terraflutamine is an active ingredient in ARAVA, and they could have granted our administrative petition on that basis. Had you raised it in the administrative petition, it was after the reconsideration request that it was raised in the complaint, right? A couple years ago. Yeah, I'm not- So I'm just saying that they could have resolved it with you. I don't think so, Your Honor. I mean, just because nothing in the- in anything that the government has said at any point, agency level, appeal level, the district court were here, suggests that any shakiness in their view on the regulatory point in any way infected or affected their review of whether, under their ordinary standards, terraflutamide was an active ingredient in ARAVA. So we, of course, the position that we're advancing is that it doesn't have to be an active ingredient, but I don't think there's anything about that that affects the agency's answer to the question whether it was an active ingredient in ARAVA. No, but you chose- Are you on the same point? You didn't go speeding through the agency saying we're in a hurry. As you said, you went in and you started this whole process in 2016, and you chose to go to the agency, and you chose to make a couple arguments, and neither of them which were the statutory interpretation question that you've raised here. And then you all chose at the literal last minute to send them a copy of your complaint raising this issue. So I can't say that there's an exception to exhaustion here because of the time frame that you all chose to press your objections with the FDA, and that you all for some reason- I mean, why did you send them that complaint? So we wanted them to be aware of what we were going to raise in court. How many pages was that complaint? It's almost exactly the same as the complaint that you have in there. So it's 40-something pages. Was there a cover letter that said, please note on page XX we have this new argument? Was there anything to alert them that you were making an argument? Because they interpreted it as you were trying to light a fire. I don't know of a cover letter that's responsive to your point, but I think- Was there a cover letter? It must have been. I'm just curious. It's not in the record. It's your obligation to show why exhaustion should be excused. And we don't have any of that material before us. All we're told is that at literally the last possible minute in this agency procedure that had gone on for five years, you logged in a 40-page complaint, and that was supposed to give them notice that on page X of those 40 pages you were raising for the first time a whole new statutory argument. Did you get nothing to say that we pointed them to it? I can't say that, other than that it's broken out as a count, but that we called it out in a cover letter. Because that's not in the record, I'm not going to say that to the court. I do think, however, it's not quite fair to say this was logged in at the literal last minute. We didn't know when, if ever, they were going to rule on this. They had sat on it for three years. So, as it turned out, they did, in fact, render their dispute resolution request. It was a couple years after your petition for, I think of it as reconsideration, but your petition for consideration with them. So it really was the last procedural step, and it was a couple years after that last procedural step had been taken. It was. Recall that under FDA's procedures you have to file that reconsideration request quickly, and they were supposed to rule on it quickly as well. They went through their internal deadlines quite substantially. Which has nothing to do with your obligation to exhaust. I agree with that, Your Honor, but you asked me a couple of moments ago about the sort of reason for the case with which you perceived my client as having proceeded in the agency, which I don't think is a fair case. Well, you proceeded in time. I'm sorry, I'm going to stop it. You proceeded in time to have included this argument amongst the other ones that you raised. Even if you figured they're going to say no, there was no reason that you couldn't have included it with the other arguments you raised, unless it wasn't something someone thought of until the very last minute. That's why you lobbed in the complaint. But then that seems a very sandbagging concern that exhaustion is supposed to prevent. Let me just go back to my answer to Judge Pillard. I don't think that there is any meaningful way in which the agency is sandbagged by having us say, we disagree with your longstanding position, but here is a way in which we win under your longstanding position. In other words, I don't think that there's any answer, any way in which the answer to the second question turns on the answer to the first question. We see them as separate. And certainly, if you look at the agency's decision, they're applying their standards for what an active ingredient is, what a fixed combination product is, and so forth. None of that would have been different if we had said, and by the way, we don't think it has to be an active ingredient at all. Maybe you can speak a little to what precisely the exhaustion requirement is here, because there's no statutory exhaustion requirement. There's always maybe some judicially imposed exhaustion requirement, but that is often not as robust as, of course, if there is a statutory exhaustion. So maybe you can speak to how you have met our circuit standards for judicial exhaustion. I think that under the applicable standards, we gave the agency a fair opportunity to answer the question that was open before the agency. It would not have been either effective or practicable to bring the other challenge in a petition for rulemaking, precisely because, just to go back to the timing in question, we first raised this in a letter in August of 2016. We could not raise this until we had an ANDA ready to file, or we would have had no stake in the issue. We filed that ANDA within a week after first raising this with the agency. A very short time after that, everyone else filed their ANDAs as well, and so Judge Collette posited that perhaps we could have sought an expedited rulemaking, but I don't think that there's any circumstances in which we could have gotten the rules changed between having our ANDA in condition to submit. Remember, you don't get first applicant status if you don't submit a substantially complete ANDA. If it gets bounced as not substantially complete, there's no point in submitting it at all. You won't get first applicant status. So very little room for error in between having a substantially complete ANDA, raising the challenge, and then the time arrives when everyone else is going to file their ANDAs. Just the point about the agency's ability to act retroactively after that point, under Bowen versus Georgetown University Hospital, the agencies don't automatically have ability to make changes in people's vested rights retroactively, and we don't know of any statutory authority for the agency to do so here. So both because it's the agency's longstanding position and because of the ANDA circumstance here and because of this Bowen point, I think those are all reasons why, under the applicable exhaustion, we weren't required to do more than we did. Do you think the government here has forfeited a reliance on Chevron deference? The government's answer is surely that they're right. In other words, that their answer is the correct reading of the statute. The one thing that I'll say is that they cite Justice Gorsuch's concurrence in the judgment in the Kaiser, in which they say the agency's contemporaneous interpretation, a dispute that it is actually contemporaneous, but let's bracket that, of the statute could be evidence of the original public meaning, and I took that to be a nod in the direction of their own interpretation is enough to make it ambiguous, but it's not clear that that's the direction in which they're going. But I took them to join issue with us on what is the correct interpretation of the statute, which is basically one step. So what they don't really join issue with us on, and they really only have one sentence on this on their brief, is the point about inactive ingredients because their regulation says, their position is that only active ingredients matter, but I just don't see how they can square that with their position with the agency's acknowledgement that inactive ingredients are approved. They have the district court correctly recognize that there's no textual basis for distinguishing between inactive ingredients and other parts of the specification that are approved by the agency. Either it's everything or it's just active ingredients, but they don't have any argument for how they can get inactive ingredients in that. Judge Millett was positing something having to do with the labeling and the fact that the name of an inactive ingredient, though not its quantity, appears in the labeling. That's not an argument. It's not a point the agency's ever made, not in the agency's regulation, not in the agency's brief in this case. I think I've responded to it on the merits, but I don't think that that would. The standard of review section does raise Chevron explicitly. There's a citation of the standard of review. They raise the Chevron. In fairness, we have not made a Chevron Step 2 argument to this point. I thought you were saying they hadn't raised it clearly in their standard of review that they get a deference. I mean, I think that if you. They cite Chevron. Yes, that's right. That's right. But I think that both they and we think that the issue here is whether the statute. My question is, I know they raise it in the standard of review, but they don't develop the argument. So I was interested to know whether you thought they had forfeited their argument about. I do think that if you go back to look at where this interpretation comes from. So they cite several times the 1994 rulemaking. I think you will look in vain in the 1994 rulemaking or the 1989 proposed rule for a reasoned interpretation of the statute underlying this interpretation. They just say that this is going to be their interpretation. And I think that to the extent that they could develop some application of agency expertise that explains why this is their interpretation. I don't think that they have it. There is basically an offhanded site in the proposed rule to agency practice. But that's not what's picked up in the statute. So I think that that recognizes that I am well over my time. But I did want to just point to one other thing, which is the other side's reliance on the statutory provisions for approval of generics, which they suggest supports them. I'll just deal with that very, very briefly, which is that a generic has to have the same active ingredient as a brand product. That's how generic approval works. It is the basis for the abbreviated new drug application that generics are approved with. But the fact that it has to have the same active ingredient, I don't think that has anything to do with whether the FDA is approving a generic's composition, including its inactive ingredients, which it does. And the statute specifically says that safety considerations are to include any safety considerations raised by the inactive ingredients. I think that just confirms our point that the agency approves a new drug application or an abbreviated new drug application in total, including the entire composition of the product. Does the court have any further questions? We'll give you some time for rebuttal. Thank you. Thank you very much, Your Honor. Mr. Hazel? Good morning, Your Honor. May it please the court, Stephen Hazel. I'd like to start with... A little quiet. Maybe if you hold the... Is this better? It's actually quite localized, so sometimes a little movement can make a difference. Is this better, Robert? Okay. Let me know if this isn't working. Thanks. I'd like to start with the exhaustion point where things left off. Nothing stopped Sandoz from raising the statutory argument in 2016. The argument was available then. It had able counsel this entire time. They filed two detailed submissions, including one that they described as a comprehensive statement of each issue to be raised. There was simply no reason why they couldn't have put the statutory interpretation argument before the agency. I think I heard counsel say it's not at all clear that the agency could have amended its regulations by 2023. That's a seven-year gap, and the requirement for exhaustion and this futility exception in particular is certainty. So if it's not at all clear, then it is clear that they haven't met this narrow futility exception to the exhaustion requirement. Counsel also said exhaustion has to be considered in terms of its purposes and what purpose this would have served. For one thing, this would have put the statutory interpretation argument squarely before the agency. FDA routinely considers statutory interpretation arguments as part of this process. This court has recognized in Continental that it's commonplace for agencies to reconsider their use of statute. But this question wouldn't have required any further factual development by the agency in order for us to review this pure question of law. Your Honor, it wouldn't have required any additional factual development. I don't read this court's cases as saying that questions of law need not be exhausted. In fact, I think there are numerous cases where questions of law have needed to be exhausted. I think it would have been particularly important in a case like this one where much of Sandoz's argument is not just about the statutory text, but about how it operates in practice. For example, counsel earlier was discussing what FDA has said about inactive ingredients, various operating manuals, other procedures like that. So this isn't a case where it's just the text and only the text. It's a case where the agency could have said, here's what we do think about inactive ingredients. Here's how all of this fits together. An expertise point? And Mr. Jay pointed out that in 1994, the FDA didn't advert to its expertise or these kind of structural arguments that you're making now are practical or procedural arguments that you're making now in the rulemaking. Do we have any way to look for an exercise of the agency's expertise on this point? You know, aside from the rule, I'm not sure, Your Honor, and I think that's yet another reason why it would have been helpful for Sandoz to raise this argument before the agency. You know, it was certainly very strange for Sandoz to go through this long process, to have these two detailed submissions, to have this idea that the agency's longstanding interpretation is just totally wrong, totally inconsistent with statute, and to not say anything about that at all until district court. I don't think that's the sort of situation where this court has typically found an exception to the exhaustion. Well, had it been raised, I assume there could have been at least some explanation from the agency about these impurities. There seems to be sort of the three categories, active ingredient, inactive ingredient, and impurities. I guess you can toss in the in vivo ingredient, but everyone agrees that's not what's approved. But in this situation, all we're talking about is an impurity and whether it's approved. And if they had raised it, I'm assuming the agency could have at least elaborated on what it thinks it's doing with respect to impurities and whether that's for purposes of the statutory language, whether it's the same or not, or talked about the structure or operation or practical consequences of their interpretation. I think that's exactly right. I think if Sandoz had raised this argument, FDA, as I said, routinely considers statutory interpretation arguments, and that would have been the case. Even if they've got a published regulation on them, they entertain them again. My understanding is that they do, Your Honor. And like other agencies, one thing that agencies do is sometimes they amend and revise the regulations, and there's certainly no certainty that the agency wouldn't have done so here. Excuse me. Can you talk a little bit about the difference between three-year exclusivity and five-year exclusivity? So why in this case does Obagio get five-year exclusivity as opposed to three-year exclusivity? So, Your Honor, the three-year exclusivity covers things including finding new dosing regimens or new patient populations. Those are important innovations, but they pale in comparison to something like Obagio, where there's a substance that is discovered and demonstrated as having a therapeutic effect for the first time. Before Obagio, there was no drug out there that had established that terraflunomide did have this therapeutic effect. So if there's a known ingredient that's put to a new use, that always gets five-year exclusivity? It depends on what you mean by known ingredient, Your Honor. If the ingredient was known as having a therapeutic effect, then that would not get five years. That would not be what FDA thinks of as a major innovation. It might get three years depending on whether it's some new dosing regimen or something like that. In this case, because this was the first sponsor to discover and demonstrate that terraflunomide did have that therapeutic effect, it was a major innovation. And that was reflected in years-long clinical trials of thousands of multiple sclerosis patients that they could sponsor for four. That's the sort of major innovation that FDA assigns this five-year exclusivity. If Sanofi came forward, instead of with Obagio, but with what it called Araba-2, they said Araba-2's active ingredient consists of the three percent, whatever the impurity level was, that was, as you say, tolerated on the prior labeling. And I go, as it turns out, and as we kind of knew all along, it turns out that a three percent amount of terraflunomide is sufficient to treat this exact same rheumatoid arthritis. They say it's a new drug because you didn't previously approve terraflunomide as an active ingredient. We're going to use the exact amount that was accepted as an impurity, and they figured out some way to make it consistently that amount instead of the instability you all point out. And they're going to use it to treat the exact same disease. Did they get five years of exclusivity then? Your Honor, if they found a way to have a fixed amount of terraflunomide in that drug, they would then have had to establish that that terraflunomide did have a therapeutic effect. They'll do the tests that you require. Because they just do the clinical trials and everything like that. It turns out it's the exact same amount that was in here all along. And everyone knows that once you swallow the pill, nobody's treated until they swallow the pill. And once you swallow the pill, it's terraflunomide that's doing all the work for treatment. And they've now found out that all it takes is three percent or 3.5 percent of terraflunomide to do that. Here's our test showing that that amount is therapeutic. And so they're going to get five years of exclusivity when that's what they were doing all along? Your Honor, if they really did show that, so I guess I should clarify that. From my hypothetical, we're assuming that the amount, I guess the maximum amount of the impurity is three percent. Is that right? Around that, Your Honor. I think it's 3.5. 3.5. Let me keep it straight in my head. So 3.5. We are now on a marketed drug with 3.5 percent terraflunomide. And that's the only active therapeutic ingredient that we are claiming. And it's to treat the exact same disease. And we're going to use Arava 2 as our name, so the public will recognize it again as treating that disease. That gets five years of exclusivity. Yes, Your Honor. Let me explain why that makes sense. In Arava 1.0, I guess you can call it, there were no studies, there were no tests of the degradant terraflunomide, before it entered the body. Those clinical trials were focused only on once it metabolized. And it turns out that you can infer from the fact that the metabolite has a therapeutic effect, that if you take that and put it in the drug product, it will have the same effect. Sometimes it does. Sometimes it does something totally different. Sometimes it does nothing at all. And so if someone came along and said, you thought you had this impurity in this earlier drug, no one really had a good idea of what it did. We've done the clinical trials. We've done the tests. And we found, wow, that actually really is, it's effective. And we've demonstrated that to FDA. And yes, that would qualify. But this is a situation where no one had any idea what that impurity did. Everyone has known from the beginning that terraflunomide is doing all the therapeutic work here. It's just whether you need the amount that comes in through the pill, or whether this 3.5% impurity would be sufficient by itself. That's all that they've proved in the intervening years. Your Honor. It doesn't seem all that innovative is what I'm trying to say. Your Honor, I mean, so this court has recognized an activist that if you take, you have a metabolite in a prior approved drug, and someone else comes along and takes that and puts that in the pro-drug or the drug product, then that can still get the… For treating the exact same disease? Even for treating the exact same disease. And so I think if that's true, then certainly someone who comes along and says, this was an impurity and it hadn't been studied in the same way, exact ingredients, you know, we're going to use that in the program. That certainly too would qualify as a major innovation. I'm a little confused by your answer. I thought on the facts here that the ex vivo terraflunomide wasn't 3.5%. It was a range. Dependent consistent degradant. This is the ex vivo. And so can you approve an active ingredient that is a degradant and there's a range from 0 to 3.5%? No, I understand the hypothetical. I was in a situation where there was a fixed amount, and so different from the facts of this case because, as you point out, in this case it was from 0.3% to 3.5%, so a tenfold range. And as we pointed out in our brief, FDA certainly couldn't approve an active ingredient for an enormous range like that for obvious reasons. Just to focus a little bit more on the statutory argument, I think, you know, as counsel acknowledged, this exclusivity provision asks whether the active ingredient in particular is approved, but the rest of the statute asks and calls for FDA to make this approval determination not for each particular part of a drug, but for the whole drug. And so I think the core statutory question here is when does that overall approval establish approval of a particular part? And I think we actually all agree that that doesn't happen all the time. It's not in total. So for drug applications, for example, everyone agrees that metabolites have to be discussed. They have to be analyzed in a drug application, but they are not approved within the meaning of this provision. So it's not in total. The same is true for drug products. Everyone agrees that sometimes impurities do not need to be identified. They don't need to be reported to the FDA. And so not everything in the drug product needs to be approved either. Instead, it's this practical inquiry. What does FDA's review actually be for this particular part of the drug? So in this case, it's particularly useful to compare what FDA does for active ingredients versus what it does for impurities, because they're really night and day. For active ingredients, FDA determines that it has a therapeutic effect and it's good for some particular purpose. And it does that based on these extensive clinical trials. And then it requires the active ingredient to actually be in the drug in a particular quantity. None of that is true for impurities. There's no determination that it's good for any therapeutic use or that it's good for anything at all. And there's no requirement that it be in the drug. Someone could sell Arava if they found a way to remove the degradant terraflinamide. Someone could sell Arava with zero terraflinamide in the drug product, and that would be within the scope of this approval. So what this statute is establishing is FDA approves the overall, and as part of that, it establishes approval of a particular active ingredient. It certainly doesn't make a particular approval decision for impurities. What about inactive ingredients? I mean, should we think about impurities and inactive ingredients in the same way? I mean, does your interpretation for the purposes of this case, which involves impurities, also affect how we should think about inactive ingredients? Your Honor, I don't think there's anything in the statute that requires them to rise and fall together. Of course FDA's longstanding understanding is that only active ingredients are approved. Impurities, I think, are a particularly clear case of something that is not approved. Some of the same reasons that we raise for impurities would extend to inactive ingredients, but I don't think there's any particular reason in this case that the court would need to go after. So we wouldn't have to reach the question of inactive ingredients. I don't think so. There's certainly no argument here that terraflinamide was an inactive ingredient in terraflinamide. I did on this statutory point, I did want to also highlight subsection 355U, which really provides strong support for FDA's longstanding interpretation. That's the section that allows when certain sorts of drugs that the sponsor can make an election and say, you know, there was an active ingredient in a prior drug. We have the same active ingredient in our drug, and we want to make the selection that says, you know, we don't want that to be considered the same active ingredient. I think, you know, that selection would have effect. It makes perfect sense under our reading. Under Sandoz's reading, it just wouldn't have any effect at all. So this entire subsection that Congress created would be the perfect list. If the amount of an impurity is bound to change beyond, say, your 3.5% limit here, it turns out it's coming in at least sometimes it's coming in at 3.7. And my understanding is that the FDA requires a resubmission if the amount of impurity has changed from what you, from the basis in which the drug was previously approved for marketing. Is that resubmission a 505B2 application, or what is it? There is a provision that describes these supplemental applications. I don't have at my fingertips a particular subsection, but that is right. It's like they have to do a resubmission, but you don't know whether it's right that it's a 505B2 submission? That's right. So if the amount of the impurity increases, my understanding is that they do have to file a supplemental for obvious reasons. If there's more of something in a drug than what it was approved for, FDA wants to know. That's not necessarily true of the amount of the impurity that decreases. So for example, if a RAVA sponsor had found a way to remove... You get the decrease because it's a cap. It's not a floor on impurities. Okay. But if it's more, and they do a resubmission, and then run whatever studies you all require to say it's fine. It's not an amount that has any harmful effect. Does FDA then approve marketing the drug with that increased amount of impurity? In that hypothetical, yes. I believe FDA would approve the supplemental application, which I think as you would expect, if there's a new impurity or if there's more of an impurity, then FDA wants to know about it. Just to give an example. It sounds kind of like they're approving the impurity in that situation because everything else stays the same in my hypothetical. So there's no changes in the active ingredient or the inactive ingredients or anything else. So the only thing that's changed is the amount of impurities increased and FDA signs off. And that's not an approval? No, Your Honor. So let me try a hypothetical. Often, as the district court pointed out, these impurities will be toxic or carcinogenic. Arsenic could be an impurity. If someone made a change and hopefully increased the amount of arsenic by a very tiny amount and FDA reviewed the supplemental application and said, well, that doesn't overmine the overall safety and effectiveness of the drug. I don't think any ordinary person looking at that would say what FDA has done there is approve arsenic. There's a huge marketing with that amount of arsenic. And that's just actually what they have done. That's right, Your Honor. FDA approved the overall drug application, the overall supplemental drug application. FDA didn't approve the toxic. Well, in the resubmission, that's the only thing they're studying is the impurity and the amount of the impurity. Everything else has already been signed off. Your Honor, just to sort of shift the hypothetical in the other way, if the amount decreased, right, if the amount decreased or the impurity was totally removed, then FDA. They don't have to do a resubmission because the impurity is arranged from 3.5%. So if it goes down to nothing, they don't have to do a resubmission, correct? Right. So you're not going to get a resubmission if it's increased. That's generally right, Your Honor. There may be cases where there are significant, where the decrease in the impurity is a result of a change in the manufacturing process. And in that case, there would need to be a supplemental application. But I think, you know, the bottom line point here is that FDA is looking at these, they're making sure that they're not. Sorry. If they just, in their manufacturing process, they figured out a way just to have a little less degradation in the fluidamide. So they are even more under that 3.5% cap and nothing else has changed. They have to resubmit. Your Honor, if there was a significant change in the manufacturing process. What's a significant one that changes the level of impurity? The mere fact that the impurity has changed wouldn't trigger the supplemental requirement. And nothing else has changed in my hypothetical, so they wouldn't have to resubmit if it goes down. It's a complicated process and you know it more than me, so I'm just, I'm trying to be too simple probably. I think that's all generally right, Your Honor. I'm just trying to leave this caveat that there are significant changes in the manufacturing process. FDA does want to see that, which I think is. I'm just curious. This is interesting. Is significant defined somewhere as an impact on active ingredient or inactive ingredients or therapy of consequence? Or what makes a change significant? So the relevant regulation, I believe, is 31470. And it defines a number of things that would trigger a supplemental application. I think as we've discussed, a mere reduction or elimination in an impurity by itself would not trigger a supplemental application. So does that regulation, I'm sorry, I don't have that one. Does that regulation define significant in terms of the active ingredient or the ingredients? I don't believe it does, Your Honor. It provides a number of examples of sorts of manufacturing changes that FDA might want to know about. Just stepping back, if we were to disagree with you and to accept Mr. Jay's reading of the statute, how broad would the disruption be for the agency? I thought I heard you say this is the only place where approval of active ingredients is called out separately. And it made me wonder. I know this is a longstanding practice and that a lot of the activity of the agency focuses on active ingredients. But I'm just trying to understand more broadly what the FDA faces if we disagree with your statutory interpretation. Your Honor, the disruption for the agency and for sponsors would be significant. So let me take each of those in turn. There obviously are very many higher approved drugs. Many of those drugs have multiple impurities. They haven't been tracked. And many of them are protracted as trade secrets. So if you're an innovator today, you really have no way of knowing whether there are prior impurities that are going to block your drug. That's a substantial injection of uncertainty in a statute that really depends on certainty. To track impurities, you track inactive ingredients. The important difference, Your Honor, aside from the fact that FDA hasn't tracked impurities over all these years is that impurities are often trade secrets. So that they couldn't, you know, perhaps the FDA themselves would track them, but they couldn't be disclosed. And not true with inactive ingredients? I would think often somebody's special, I don't know, coding or filler. So, Your Honor, details about how to produce active ingredients might be trade secrets. But the identity of the active ingredient itself. Inactive. Inactive ingredients? Yeah. You're comparing impurities and inactive ingredients, I thought. I was, Your Honor, I was comparing impurities and active ingredients. Okay. So active ingredients, their identities are disclosed on the FDA website. Impurities, they're not disclosed. And many of them couldn't be because of those trade secrets. Inactive ingredients are exposed on the website. But some of them must also be trade secrets. That was my question. So my understanding is that inactive ingredients themselves, their identities, are not trade secrets. Those are disclosed on the website, so everyone can take a look at that. Again, that's not something I've studied for this case just because we're not dealing with inactive ingredients. So you were saying that there were many things that would be disruptive either for the agency and or for sponsors. And you started with that it would be hard to track impurities? That's right, Your Honor. So if you're a sponsor today, thinking about whether to invest in this very time and money intensive process, you have to think about these hundreds or thousands of impurities and prior drugs that might block your, specifically block your status as a major innovation. I think that's a substantial disruption. Of course, you also asked about disruption for the FDA. The FDA has been doing this for 30 years. There may be many current drugs that have a five-year exclusivity that may lose that exclusivity as a result of saying, well, any prior impurity would put apart your major innovation status. So I think there's significant disruption for the agency and for sponsors themselves. But it wouldn't really change the examination, the distinct treatment of active ingredients, which, as you say, have to be supported by clinical studies versus impurities and maybe inactive ingredients where the question is just are they safe? That you would still be able to operate with that focus or not. Well, it just seems like the kind of attention in an approval of a drug varies depending on what the role is of the ingredients. And it seems like one of the potential unsettling facts of Mr. Jay's interpretation is that it kind of mixes and matches those roles in successor drugs. And I just don't know. You're the expert. But it just seemed to me that that might actually have a deeper impact on the agency in terms of what you'd have to examine in approving something as an inactive ingredient or an impurity in a drug if it's going to then be considered to be approved in a broader sense. I think that's exactly right, Your Honor. I mean, FDA has thought of impurities in this particular way that I've described earlier. And I think, you know, for Sandoz, under their interpretation, FDA would be thinking of impurities as very different, as things that, you know, if this is something that we approve, it would block all future drugs from the five-year activity based on the presence of that substance. And I think that's right. I mean, FDA would need to give quite a bit of thought to how it would operationalize that and how its review of impurities would need to change as a result. I think the other odd effect of Sandoz's reading is that it means that, you know, someone who comes along today discovers and demonstrates that a substance has a therapeutic effect for one disease, a cancer drug, that could be blocked by the pure happenstance that some drug decades ago for heart disease. So, you know, if you have a substance that's a therapeutic for heart disease, that's the same one in your cancer drug. It's really hard to understand why Congress would have designed the scheme. Well, you're saying blocked, but it's actually quite the opposite. It would open up to development. But I guess you're saying it would block the exclusivity, meaning it would deprive people of the carrot, companies of the carrot that might spur them. Right. It would deprive them of the significant incentive that Congress created to spur the development of these new drugs. Just one quick question about its impurities. Here the impurity is actually a chemical ingredient. But could an impurity be water that comes in through condensation, something commonplace? I don't know enough about the science to know whether water was qualified, but certainly there are substances like that that are either they're sort of byproducts of manufacturing. They're just a natural degradation process. I think we've given some examples and the district court gave a couple others. But, you know, it could be something either toxic or something. And that's pretty obviously innocuous that no one, you know, neither the district court or Congress is particularly worried about. I'm just thinking that if some water or something, that's a chemical at the end of the day, but water, just something completely routine and generally unregulated could come in, then that would mean no one could get five years of exclusivity even if some condensation came in because that would be deemed approved. I'm not having a sense of what the breadth is. It really is just all chemicals that I can't pronounce. If that's sort of the rule, then that seems different. And I think that's exactly right. And that's another problem with their interpretation. An impurity, a substance that appears an impurity in one drug might be a substance that's used in all sorts of ways and all sorts of future drugs. And if its presence and mere presence in a prior appeal drug really blocks this five-year exclusivity, then that is undermining this incentive created by Congress. I know I'm well over time, so unless there are any further questions. All right. Thank you very much. Appreciate your extra time. And Mr. Jay, we'll give you three minutes. Real quick, can impurity be something just like water? Generally not, no. So a contaminant is not an impurity in the relevant sense, so something that comes in from outside and is not part of the manufacturing. Not part of it. Something that comes in from outside, extrinsically, is not an impurity in the relevant sense. I don't know what you mean by inside or outside. Some water could drip in or some condensation on the machine drops some water in. No, that would not be, as I understand it. So degradation products, which is what we're specifically talking about, that's addressed in the second of the two guidances. But there's lots of impurities, and your position is about impurities. Well, impurities that rise to the level of qualification so that they actually get set in the specification. So a limit gets set in the specification. So where we're talking about this type of impurity, there are two kinds, where the drug substance reacts with either an inactive or with the packaging and produces something else. So in other words, a degradation product is a result of a chemical reaction that the drug substance, which is the active ingredient, degrades into after reacting with something else. I'm just going to give you a couple more minutes for my colleagues' questions. Is there just a definition of impurity somewhere that's different from outside contaminant? The agency has defined an impurity as a component. It is not an active ingredient or an inactive ingredient. I realize that that's not 2%. So our position really only goes to impurities that are approved. The agency has thresholds below which an impurity, so set aside the contaminants, impurities that are below the identification threshold, those would be out. Sorry, the reporting threshold would be out. Impurities that are below even the identification threshold, those would be out. The ones that are controlled by the agency are those for which a limit is set in the specification. Often that's done through what the agency calls qualification. You've kind of heard my answer. Okay, great. Sorry. And that is a process that doesn't also have a parallel with respect to inactive ingredients? It does. It absolutely does. Right. And this really is one of my central points. So your position would affect that too? Well, it doesn't change anything that the agency is doing. But it would affect the implications of an approval of a drug that included defined inactive ingredient. Absolutely. Absolutely. That's a central part of our point. And I heard no satisfying response from my friend too, which is the point that the agency acknowledges that it approves inactive ingredient, but their long-standing. As such. Sure. That's right. So then the question is, does the statute require approval or approval as an inactive, sorry, as an active ingredient? But there's no distinction there, no delay between inactive ingredients and impurities. Like either they're approved in the relevant sense, and we say they are because they both go to safety. Or there's some extrinsic requirement that applies only to active ingredients. Now, my friend cited 355U, or 505U, the thing about. Can I just say on the inactive ingredients? I mean, so your position would block five-year exclusivity for any inactive ingredient or impurity that was previously part of a drug application? It would. It would allow them to get three-year exclusivity. It would block five-year exclusivity for any inactive ingredient or impurity. Well, I mean, this came up in the top side of the argument, right? The blocking is what's done by the exclusivity itself. It would make them ineligible for five-year exclusivity and permit them to the lesser, but still significant, three-year exclusivity. And I think my friend's discussion of three-year exclusivity really sold that form of exclusivity short. I think, for example, the innovations in which a molecule is completely repurposed for a completely different therapeutic use, that may require a lot of study, both as to safety and efficacy, but you still only get three-year exclusivity. In particular, it might have only appeared in a product as one of multiple active ingredients. When you study it for a new use, you still only get three-year exclusivity. This is not a major disruption. Five-year exclusivity is for genuinely new chemical entities. And one specific element of that is the enantiomer race-mate statute that my friend referred to. I think it's important context to note that that statute overturned, in a targeted way, a long-standing FDA interpretation, which was set out in the Federal Register in 1989, 54-FEDRAG-28898. The agency had second thoughts about it, thought about changing it. Congress waited 10 years from its request for comment in 1997, and then in 1998, 54-FEDRAG-28898, in which the agency said, a single enantiomer, so like the left-handed version of a previously approved race-mate, where, you know, a 50-50 mixture, both left and right hands, contains a previously approved active moiety, and is therefore not considered a new chemical entity. So Congress, and this is very clear from the background of this statute, got tired of waiting for the agency to change that, and said, you're going to, in just the left-handed NDA, you can say this is not the same thing as the active ingredient in the old one. And a race-mate drug is one that has a 50-50 mixture as its active ingredient. So we still think that that is probative, and I wanted to give the background. Cognizant of not going over time, I do want to answer Judge Pillard, your question about the patents. I think the answer is the U.S. patent, which was issued in 2006. By that time, the assignment to Sanofi was complete, but when it was filed, which is what you and I were talking about, in 1997, I believe, Hooks was the applicant, and you can see that in a Canadian patent from the same year, which is issued to Hooks. I think everything that I wanted to cover, except just to point that the timing has now run very, very short, and if the court does not act, if it is to rule in our favor, if it does not act in time for FDA to implement that by March 12th, all of this will have been turned off, because the other generics will be able to launch as of that date. Now, unless the court has any further questions? Thank you very much, Your Honor. Thank you very much. We appreciate counsel's helpful arguments and the cases submitted.
judges: Millett, Pillard, Rao